# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 98 C 7182 | DATE | 5/31/2001 |
| CASE TITLE | MACSTEEL INTERNATIONAL vs. SUPERIOR PRODUCTS COMPANY | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Enter Memorandum Opinion And Order. Plaintiff's motion for summary judgment is denied. Status hearing held and continued to June 27, 2001 at 9:30 a.m.
(11) ☒ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JUN 04 2001 date docketed | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | FILED FOR DOCKETING 01 MAY 31 PM 5: 44 | | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| LG courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT,
# NORTHERN DISTRICT OF ILLINOIS,
# EASTERN DIVISION.

| | |
|---|---|
| MACSTEEL INTERNATIONAL USA CORP., <br><br> Plaintiff, <br><br> v. <br><br> SUPERIOR PRODUCTS COMPANY, INC. <br><br> Defendant. | Case No. 98 C 7182 <br><br> The Honorable John W. Darrah |

DOCKETED
JUN 0 4 2001

## MEMORANDUM OPINION AND ORDER

Plaintiff MacSteel International ("Plaintiff" or "MacSteel") has filed a one-count amended complaint against the Superior Products Company, Inc. ("Defendant" or "Superior") for breach of contract. Plaintiff has moved for summary judgment pursuant to FED.R.CIV.P. 56. For the reasons that follow, Plaintiff's Motion for Summary Judgment is DENIED.

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses..." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the Court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings,

affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

## BACKGROUND

The facts (referred to herein as "Pl.'s 56.1" and "Def.'s 56.1") considered for this summary judgment motion are as follows.

Plaintiff MacSteel is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in White Plains, New York. (Pl.'s 56.1 ¶ 2). Defendant Superior is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Kankakee, Illinois. (Pl.'s 56.1 ¶ 3).

On October 15, 1997, MacSteel sent a fax to Superior Wire. (Pl.'s 56.1 ¶ 5). The fax was addressed to Tom Rex at Superior Wire and stated in relevant part: "[A]s per our telcon today, we

herewith confirm our sale to you of 1,400 net ton of wire rod in coil as follows .... Looking forward to receiving your P.O." (Pl. Ex. 3). Two days later, on October 17, 1997, Superior Wire transmitted to MacSteel its Purchase Order No. 58407, which requested 1,400 net tons of wire rod with certain specifications. (Pl.'s 56.1 ¶ 6, Pl. Ex. 4).

On November 26, 1997, Superior Wire delivered to MacSteel Purchase Order No. 58408, which was entitled "Revision from P.O. # 58407." (Pl.'s 56.1 ¶ 7, Pl. Ex. 5). This communication doubled the amount of the order to 2,800 tons. (Pl. Ex. 5). That same day, MacSteel sent Superior Wire a fax confirming receipt of Purchase Order No. 58408. (Pl.'s 56.1 ¶ 8).

Under the terms of the agreement, payment was due within 50 days of the arrival of the first barge. (Pl. Ex. 6). In February 1998, MacSteel delivered 1,759 coils of wire rod, bearing a total weight of 6,742,389 pounds, to Superior Wire F.O.B. barge in Joliet, Illinois. (Pl.'s 56.1 ¶ 10). MacSteel sent Superior Wire an invoice, dated February 16, 1998 in the amount of $977,646.42 for the 6,742,389 pounds of wire rod that it delivered to Superior Wire. (Pl.'s 56.1 ¶ 12). This invoice showed a due date for payment of April 17, 1998. (Pl.'s 56.1 ¶ 12).

On March 2, 1998, Superior Wire shipped ten coils of wire rod (weighing 39,150 pounds) to an unnamed company. (Pl.'s 56.1 ¶ 18). On March 4, 1998, Superior Wire sold 11 coils of the wire rod, weighing 43,065 pounds, to a company in Stacy, Minnesota called Royal Concrete Pipe. (Pl.'s 56.1 ¶ 14). Beginning on March 26, 1998 and continuing through the months of April, May, June, July, August, and ending on September 24, 1998, 2,025,785 pounds of the wire rod (1,013 tons) were purchased by Dur-O-Wal, Inc. (Pl.'s 56.1 ¶ 15). On or about April 28, 1998, Superior Wire sold to or allowed to be taken by Richmond Anchor and Screw 12 coils of the wire rod, weighing 45,780 pounds. (Pl.'s 56.1 ¶ 16). Additionally, Superior Wire has used, "for its own

purposes," 21 tons of the wire rod. (Pl.'s 56.1 ¶ 17, Pl. Ex. 9). Superior Wire has never sought or received any payment for any of the wire rod sold to Dur-O-Wal under the aforesaid agreement, and all money paid by Dur-O-Wal went directly to MacSteel. (Def.'s 56.1 ¶ 20).

Superior contends that in March, 1998, when the first coils of the wire rod were delivered to Dur-O-Wal, it was discovered, after tensile testing, that the wire rod did not meet the purchase order requirements as to minimum tensile strength and had insufficient tensile strength for its intended use. (Def.'s 56.1 ¶ 11). MacSteel disputes Superior's claims that it did not know of the tensile strength before this date and that the wire rod did not meet the requirements of the purchase order. (Pl.'s Res. to Def.'s 56.1 ¶ 11). The litigants also dispute whether the material, as delivered, could be used by Superior's customers. (Def.'s 56.1 ¶ 12). Superior further contends that, upon discovery of the alleged nonconformity, it notified MacSteel's salesperson that the rod was unsuitable for its needs and not in conformity with the purchase order. (Def.'s 56.1 ¶ 14). In early April 1998, Superior alleges that MacSteel's salesperson instructed Superior to sell the rod to Dur-O-Wal at a reduced price of $13.50. (Def.'s 56.1 ¶ 16). MacSteel gave no other instructions to Superior Wire regarding disposition of the rod. (Def.'s 56.1 ¶ 18).

On July 8, 1998, approximately five months after MacSteel delivered the rod to Superior in Joliet, MacSteel wrote to Superior demanding payment for its February 1998 shipment of wire rod. (Pl.'s 56.1 ¶ 20). In the letter, MacSteel stated that, "To date, nothing has been paid, although our understanding is that a good portion of the material has been processed." (Pl.'s 56.1 ¶ 20). Superior Wire's counsel responded via fax on July 14, 1998. (Pl.'s 56.1 ¶ 21). The fax stated in relevant part:

> As I am certain you are aware, the reason that payment has not been made by Superior Wire, to date, is that the steel sent by MacSteel International USA Corp. did not meet the minimum requirements as stated on the Purchase Order; it was not mesh

> quality steel. Therefore, Superior Wire could not use the wire. One of Superior Wire's customers, Durawall, has been able to use 500 tons of the approximately 3,000 tons sent as of July 3, 1998. They believe they may, over an extended period of time, be able to use the inferior wire and are willing to pay the 13.50/cwt. as they use it. Durawall is willing to make arrangements for immediate payment for the amount used so far. As the additional material is processed, MacSteel International USA Corp. will be paid for the material. However, a set payment arrangement is not feasible at this time. The other solution is for Superior Wire/Durawall to pay for the amount used to date, and MacSteel International can reclaim possession of the unused portion of steel. It is warehoused at Marine Transit in Joliet, Illinois.
>
> Had the material conformed with the Purchase Order, payment under the 60-day term would have been possible, as the material would have been used within that time, enabling payment. However, the steel delivered did not meet the Purchase Order and was not usable for the purposes it was purchased.
>
> Although Superior Wire also wishes to avoid litigation, if possible, we feel very strong in our position that MacSteel International breached the Purchase Order, which would absolve Superior Wire of any duty to pay. However, it appears in both parties' best interests to attempt to work out an amicable solution to this matter. Therefore, please consider both of the options above referenced and contact me at your earliest convenience.

(Pl.'s 56.1 ¶ 21, Pl.'s Ex. 17). MacSteel then responded with its own fax on July 15, 1998, which

stated in relevant part:

> First, we entirely disagree with your assertion that the material delivered did not comply with the Purchase Order of Superior Wire because it was not "mesh quality steel". This is surprising because it is the first time any representative of Superior Wire has taken that position; prior discussions have involved the tensile strength of the steel, which is a specification Superior Wire actually included in its hand-written Purchase Order. In any event, the material most certainly was not "mesh quality steel".
>
> Second, our contract partner is not Durawall; it is Superior Wire, whose credit was evaluated at the time the contract was being discussed. If Superior Wire has chosen to resell or otherwise make the material available to Durawall, that is Superior Wire's choice. We will continue to look to Superior Wire for payment.
>
> Lastly, we cannot (nor would Superior Wire) accept a payment arrangement "over an extended period of time" as material is processed without any outside date.

In an effort to resolve this matter, we are prepared to accept the following revision to the present contractual agreement:

1. Superior Wire will make prompt payment at $13.50/cwt for material processed by Superior Wire or its customer prior to June 30, 1998 with interest at the rate of 9% per annum from May 1, 1998 to the date of payment.

2. Superior Wire will make monthly payments (at the same price) on August 7, 1998, and the fifth business day of each calendar month thereafter for material processed by Superior Wire (or its customer) within the preceding calendar month, with interest at the same rate from May 1, 1998 through the date of payment.

3. The purchase price for any material not processed (and paid for) by January 31, 1999 will be paid for by Superior Wire on February 5, 1999 with interest (at the same rate) from May 1, 1998 to the date of payment.

We believe the above to be fair and reasonable to both parties....

(Pl. Ex. 18). On September 1, 1998, Superior Wire responded via fax, stating:

We stated in the previous correspondence that the material delivered did not comply with the purchase order and was not fit for the purpose intended.

In this regard, Durowal, our primary customer, accepted only 781.97 tons, and we were able to use, for our own purposes, only 21 tons. The total value of the material, at $13.50 per ton, was $218,540.00.

In an effort to resolve this matter, and without prejudice to our rights to dispute any obligation to you, we suggest that we pay to you the sum of $218,540.00 and you may take possession of the remainder of the steel premises.

We recognize that it is your view that the steel met the specifications however it is clear, both from our own records and the records of Durowal, that the steel is substandard. As such, we have offered reasonable proposals to resolve the outstanding issues, without the necessity of incurring further legal costs.

(Pl.'s 56.1 ¶ 24). MacSteel responded via fax a week later, on September 8, 1998, saying:

Unfortunately, after reviewing the facts, we are unable to accept your offer.

Tom, as I see it MacSteel International delivered what was ordered by Superior Wire, on time. The material was delivered over 6 months ago, and we have not received one penny for our sale. You mention in your offer that "Durowall" has used only a

limited quantity of the steel, with all due respect Durowall is not our customer and therefore not our concern. We had a contract with Superior Wire; we lived up to our contract. We have conceded that a part of the cargo was damaged and are willing to take back that portion which is salt water damaged.

You also refer to "substandard" material. Tom, what is the basis for such statement? If we did not comply with your PO, please clarify exactly what the problem is and we will try to assist, without this I see no way of granting any further discounts.

We are facing serious financial consequences for which you must be held fully responsible if we are not able to come up with an equitable solution to this matter. It is patently unreasonable to request us to take back material sold to you six months ago!

Without prejudice, we reopen the above mentioned offer for your reconsideration until our close of business September 11, 1998. We look forward to your acceptance.

(Pl.'s Ex. 20).

On November 10, 1998, MacSteel filed the present case against Superior, requesting the principal amount of $733,037.22. (Pl.'s 56.1 ¶ 27). This amount reflected a reduction of $244,609.20 from the original invoice amount of $977,646.42 based on the fact that 352 coils had been damaged by salt-water rust and that 88 of them were physically damaged prior to being unloaded. (Pl.'s 56.1 ¶ 28). On or about April 5, 1999, Superior and MacSteel entered into a letter agreement concerning payment for the rod previously used by Dur-O-Wal. (Pl.'s 56.1 ¶ 29). Pursuant to the agreement, on April 12, 1999, MacSteel's counsel received from Dur-O-Wal a payment, which reduced the amount in controversy by $293,770.00 (i.e., from $733,037.22 to $439,267.22). (Pl.'s 56.1 ¶ 32). On or about May 26, 1999, MacSteel and Superior entered into an additional letter agreement, by which the wire rod which remained from the original 1,759 coils would be sold without prejudice to either of the litigants' rights in the lawsuit. (Pl.'s 56.1 ¶ 33). MacSteel received a payment of $117,837.87 from Dayton-Superior Corporation, reducing the

amount in controversy from $439,267.22 to $321,429.35. (Pl.'s 56.1 ¶ 34, 35).

Superior Wire was able to use, for its own purposes, 21 tons of the steel rod. (Pl.'s 56.1 ¶ 17, Pl.'s Ex. 9).

## DISCUSSION

Plaintiff MacSteel has moved for summary judgment on the $321,429.35 balance of the original agreement, arguing that Superior Wire's conduct after delivery of the wire rod constituted acceptance of the wire rod pursuant to 810 ILCS 5/2-606(1)(c). MacSteel argues that Superior Wire accepted the wire rod since its conduct constituted acts "inconsistent with the seller's ownership" under 810 ILCS 5/2-606(1)(c). MacSteel specifically cites: (1) Superior Wire's sale of 43,065 pounds of the wire rod to Royal Concrete Pipe on March 4, 1998; (2) Superior Wire's sale of 2,025,785 pounds of the wire rod to Dur-O-Wal from March to September, 1998; (3) Superior Wire's sale of 45,780 pounds of the wire to Richmond Anchor and Screw on April 28, 1998; and (4) Superior Wire's use of at least 21 tons of wire rod "for its own purposes," (Pl. Mot. 3) as evidence of acts inconsistent with MacSteel's continued ownership of the wire rod.

MacSteel has not met its burden of showing the absence of disputed issues of material fact which would entitle it to judgment as a matter of law. The issue of whether Superior Wire's conduct after delivery constituted acceptance need not be reached. Even if Superior's conduct was found to constitute acceptance, it cannot be concluded, as a matter of law, that Superior did not revoke the acceptance after discovery of the alleged defect or that any of its subsequent conduct constituted acceptance after revocation.

Drawing all inferences in the light most favorable to Superior Wire, both Superior Wire's sale of 43,065 pounds of the wire rod to Royal Concrete Pipe on March 4, 1998 and its initial sale

to Dur-O-Wal preceded its discovery of the alleged defect in the tensile strength of the wire rod.[1]
Once again, drawing all inferences in favor of the opposing party, Superior Wire promptly notified
MacSteel of the nonconformity of the wire rod after discovery. (Def.'s 56.1 ¶ 14). Superior Wire
bases its right to reject acceptance on 5/2-608(1). This provision states:

> (1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it
> (a) on the reasonable assumption that its non-conformity would be cured and it has not been reasonably cured; or
> (b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

Given the disputed facts of this case (particularly the alleged difficulty of discovery of the supposed defect), the issue of whether Superior's revocation conformed with 5/2-608(1) is one best resolved at trial.

Furthermore, disputed issues of material fact exist which preclude a finding that Superior Wire's post-discovery conduct constituted acceptance. Under 5/2-604, a buyer may sell goods after revocation in the absence of direction from the seller. 5/2-604 states in relevant part:

> if the seller gives no instructions within a reasonable time after notification of rejection, the buyer may store the rejected goods for the seller's account or reship them to him or resell them for the seller's account with reimbursement as provided in the preceding section. Such action is not acceptance or conversion.

Given MacSteel's repeated demands for payment and failure to accept Superior's offer to reclaim the goods, a reasonable juror might conclude, under the circumstances, that MacSteel's additional sales were reasonable under 5/2-604. Additionally, if Superior is taken at its word, and MacSteel

---

[1] MacSteel has not moved for summary judgment on the grounds that the wire rod, as delivered, met the specifications of the contract; rather, in its Motion, MacSteel has chosen to proceed solely on the issue of whether Superior Wire accepted the wire rod.

did approve the additional sales to Dur-O-Wal or its affiliate, then these additional sales could hardly constitute acceptance after revocation. As to Superior's own use of some of the wire rod, Superior has explained that it used this rod to test for tensile strength. This use can hardly be considered acceptance.

## CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Summary Judgment is DENIED.

**IT IS SO ORDERED.**

John W. Darrah, Judge
United States District Court

Date: May 3, 2001