

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 7182 | **DATE** | 3/27/2002 |
| **CASE TITLE** | MACSTEEL INTERNATIONAL USA CORP. vs. SUPERIOR PRODUCTS COMPANY, INC. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Opinion And Order. It is ordered that judgment be entered in favor of plaintiff, the MacSteel International USA Corporation, in the sum of $333,742.82 plus prejudgment interest at a rate of five percent per annum, on plaintiff's complaint. Judgment is entered in favor of plaintiff and against defendant on defendant's counterclaim. Status hearing set for April 4, 2002 is stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | MAR 27 2002 date docketed | |
| ✓ | Docketing to mail notices. | | S1 |
| | Mail AO 450 form. | CDY docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| LG | courtroom deputy's initials | date mailed notice | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| MACSTEEL INTERNATIONAL USA CORPORATION, | ) ) ) ) | |
|---|---|---|
| Plaintiff, | ) ) ) | Case No. 98 C 7182 |
| v. | ) ) | Hon. John W. Darrah |
| SUPERIOR PRODUCTS COMPANY, INC., (Superior Wire Division), | ) ) ) ) | |
| Defendant. | ) | |

DOCKETED
MAR 27 2002

## OPINION AND ORDER

Plaintiff, MacSteel International USA Corporation ("MacSteel"), brings this action against Defendant, Superior Products Company, Inc. ("Superior"), for an alleged breach of contract, seeking payment for wire rod sold to Superior. Superior filed an answer and counterclaim alleging that the wire rod sold by MacSteel did not conform to the requirements of the contract and that Superior did not accept, or revoked its acceptance of delivery of, the wire rod. Superior further alleged that the wire rod delivered by MacSteel constituted a breach of warranty of merchantability and warranty of fitness for a particular purpose.

Trial was by the Court without a jury on December 3 through 5, 2001. The Court has considered the evidence, including the testimony of witnesses and exhibits, and has further considered the written arguments of counsel for the parties and the authority cited therein.

Pursuant to Federal Rule of Civil Procedure 52, the Court hereby enters the following written



Findings of Fact and Conclusions of Law which are based upon consideration of all the admissible evidence as well as the Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

## FINDINGS OF FACT

*Industry Background*

Plaintiff, MacSteel, is a corporation incorporated under the laws of the state of Delaware with its principal place of business in White Plains, New York. Defendant, Superior, including the Superior Wire Division, is a corporation incorporated under the laws of the state of Michigan. The Superior Wire Division's principal place of business was located at 504 Railroad Avenue, Joliet, Illinois, and relocated in 1999 to 215B South Route 45-52, Kankakee, Illinois.

Superior is engaged in the business of buying wire rod. Superior would either resell the wire rod in the undrawn state to others or draw the wire rod into wire on its wire-drawing machinery either for Superior's own use or for resale as wire to third parties. Superior sells wire and wire rod to customers who manufacture concrete pipe mesh as well as those who do not.

Wire rod is a steel product that is first descaled then placed on a wire-drawing machine, which pulls the rod through dies. Travelling through the dies reduces the diameter of the rod and, thus, transforms the wire rod into wire. The resultant wire can then be used for a number of purposes, including link fencing, nails, wire baskets, shelving, tie wire, grape stakes, and concrete reinforcement (for such uses as concrete pipe, concrete floors, driveways and sidewalks).

The extent to which a piece of wire rod is drawn down in diameter from its original size is

referred to as the amount of reduction of the rod. The greater the percentage of reduction, the smaller the diameter of the resultant wire. A forty-one percent reduction of a six millimeter rod, for example, yields a wire of .182 inch diameter. The size of a wire can also be stated in terms of its particular gauge. For example, a wire .182 inch in diameter is also referred to as 6.75 gauge wire. Drawing rod down by thirty percent would result in wire having a diameter of about .196 inch (".196 wire"). Drawing rod down by twenty-three percent would result in wire having a diameter of about .207 inch (".207 wire"). Drawing rod down by thirty-four percent would result in wire having a diameter of about .192 inch (".192 wire").

Wire may be used to produce wire mesh. Wire mesh can be made from wire drawn to various sizes, including 9 gauge (.149 $inch^2$) wire and 10 gauge (.135 $inch^2$) wire. Wire mesh has a number of applications. One such application is concrete pipe mesh. A specification known as American Society for Testing and Materials ("ASTM") A-185 relates to wire mesh used for concrete reinforcement but not for other uses of wire mesh. Wire that is used to produce wire mesh subject to ASTM A-185 must meet the specifications of ASTM A-82, but wire that is used for other wire mesh applications does not need to meet the specifications of ASTM A-82.

The tensile strength of steel is its lateral strength, measured as the amount of force it takes to pull that piece of steel apart. Tensile strength is expressed in pounds per square inch (psi) or kilograms per square millimeter in the metric system. The tensile strength of the type of rod involved in this case increases by 600-650 psi with each percent of reduction.

ASTM A-185 incorporates by reference the minimum tensile strength requirements of ASTM A-82. ASTM A-82 also represents the standard for the minimum tensile strengths for building mesh, structural mesh and paving mesh. In the steel wire and rod industry, mesh is synonymous with the

term welded wire fabric. The minimum tensile strength requirements of ASTM A-82 for wire to be used in welded wire fabric is 75,000 psi.

Superior makes and sells wire of various sizes, including .149 inch (9 gauge) (a 60% reduction of a six millimeter rod), .178 inch (a 44% reduction), .187 inch (a 37% percent reduction), .192 inch (a 34% reduction), and .207 inch (a 23% reduction). Nine gauge wire is used for masonry reinforcement.

*The Transaction between the Parties*

In the fall of 1997, Jeff Ratzker, a steel trader at MacSteel, cold-called Thomas Rex ("Rex"), president of Superior, and asked whether Rex would be interested in purchasing certain six millimeter wire rod that MacSteel had available from the Krivoy Rog Mill in the Ukraine. Upon learning the origin of the steel, Rex called some of his contacts in the industry to discuss with them what they knew about the Ukrainian rod that was coming into the United States.

On or about October 15, 1997, MacSteel sent Superior a telefax. The telefax stated, in relevant part, "Looking forward to receiving your P.O. [Purchase Order]." On or about October 21, 1997, Superior transmitted to MacSteel its Purchase Order No. 58407 ("P.O. No. 58407").

On or about November 26, 1997, Superior delivered to MacSteel Purchase Order No. 58408 ("P.O. No. 58408"), which was described as a revision to its P.O. No. 58407. Superior's revised purchase order increased the tonnage of the goods ordered from 1,400 metric tons to 2,800 metric tons.[1] The revised purchase order also decreased the price from $14.75 per hundredweight to $14.50 per hundredweight. In all other material respects, P.O.s Nos. 58408 and 54807 were the same. The

---

[1]While there are 2,000 pounds in a ton, there are 2,204.623 pounds in a metric ton.

term "MAX" in Superior's P.O. No. 58408 means "maximum".

On or about November 26, 1997, MacSteel sent a telefax to Superior confirming receipt of Superior's P.O. No. 58408. The parties agreed that MacSteel would be paid within fifty days of the arrival of the first barge load of the goods at Joliet, Illinois. It is the practice in the steel industry, as detailed in ASTM A-510 concerning wire rod, for buyers with special requirements to state those requirements in their purchase orders. Neither the telefaxes from MacSteel nor the purchase orders from Superior refer to ASTM wire standards A-82 or A-185 or to a minimum tensile strength of 75,000 psi or to any minimum tensile strength whatsoever or to the use of the rod for the manufacture of wire to be used in concrete pipe mesh. Superior made no reference to ASTM A-82 until the week of April 15, 1998, more than four months after the contract was formed and two months after the rods were delivered to Superior.

The contract required delivery of mesh quality rod. Mesh quality refers to the most basic low-carbon steel rod. Unlike other grades of wire rod, mesh quality has no defined product specifications in any industry publication. The term mesh quality does not imply any minimum tensile strength.

On or about January 30, 1998, MacSteel provided, and Superior received, the mill test certificates for the wire rod. Mill test certificates are provided to buyers of steel to enable them to verify whether the steel conforms to contract specifications. The mill test certificates showed that the chemistry of the steel was within the parameters the parties agreed upon for the eight chemical elements of carbon, silicon, manganese, sulfur, phosphorous, chromium, nickel and copper. The certificates showed that the tensile strength of the rod ranged from 50,790 psi to 58,058 psi. Measurement of samples of the rod showed that the rod was six millimeters in diameter. It is the

custom and practice in the steel industry to rely on mill test certificates as authoritative as to the chemical composition and tensile strength of the steel to which the certificates relate. The rod delivered by MacSteel to Superior would have met the minimum tensile strength standard set forth in ASTM A-82 for wire used in concrete reinforcement (75,000 psi) if drawn to 7 gauge (.177 inch) or smaller, such as 9 gauge (.149 inch) and 10 gauge (.135 inch) wire both of which are used to make mesh. Over eighty-five percent of the rods would have met the ASTM A-82 wire standard for 6.5 gauge (.187 inch) wire. Forty percent of the rods would have met the ASTM A-82 wire standard for six gauge (.192 inch) wire.

Superior performed its own tensile strength test upon the wire rod. It obtained results of approximately 52,000 to 53,000 psi on the rod. This tensile strength reading is consistent with the tensile strength for the rod set forth in the mill test certificates.

Application of the standard calculation for predicting the tensile strength of wire to the mill test certificates would show that if the rods were reduced by thirty percent, thereby increasing tensile strength by 18,000 psi, in almost every instance, the tensile strength of the resultant wire would have been less than 75,000 psi and, in no instance, greater than 100,000 psi.

In February 1998, MacSteel delivered 1,759 coils of wire rod bearing a total weight of 6,742,389 pounds (which is 3,058 metric tons) to Superior free on board ("F.O.B.") barge in Joliet, Illinois.

On or about February 13, 1998, the rod was delivered to the dock in Joliet and unloaded onto the dock by Tri-River Docks, Inc. Superior paid $16,860.00 to Tri-River Docks, Inc. for costs incurred in unloading the rod from the barge onto the dock in Joliet.

MacSteel sent Superior an invoice, dated February 16, 1998, in the amount of $997,646.42

(14.50 cents per pound x 6,742,389 pounds of wire rod delivered). Dur-O-Wal is Superior's primary customer.

Superior had arranged to resell 1,000 of the 2,800 tons to Dur-O-Wal. On or about March 2, 1998, Superior shipped ten coils of the rod, weighing 39,150 pounds, to Dur-O-Wal. Sometime during the week of April 15, 1998, Rex called Ratzker and told him that Superior could not use the wire because the tensile strength was too low. Mark Rosner of MacSteel met with Rex on April 21, 1998 to discuss Rex's complaint about the tensile strength of the rod. After the April 21, 1998 meeting, Superior continued to use and resell the rod. However, on or about April 1, 1998, Dur-O-Wal, Superior's "primary customer", sent Superior Wire a purchase order numbered 28424 ("P.O. No. 28424"). Dur-O-Wal used the wire rod to produce wire that was subject to ASTM A-82. Superior sold wire rod to Dur-O-Wal during April, May, June, July, August and September of 1998. On or about March 4, 1998, Superior sold eleven coils of the wire rod, weighing 43,965 pounds, to Royal Concrete Pipe, a company in Stacy, Minnesota. Superior has used, for "its own purposes", twenty-one tons (42,297 pounds) of the wire rod.

On July 8, 1998, Donald Wefer of MacSteel wrote to Superior, demanding payment for MacSteel's February 1998 delivery of wire rod. Wefer noted that "To date, nothing has been paid, although our understanding is that a good portion of the material has been processed." In July 14, 1998, Superior's attorney wrote MacSteel in response to its July 8, 1998 letter. Superior's July 14, 1998 letter stated that the steel delivered did not meet the minimum requirements stated on the P.O. However, Superior did not release the wire rods to MacSteel.

MacSteel sought the principal amount of $733,037.22 due and owing as of April 17, 1998. This claim represents a reduction of $244,609.20 from the original February 16, 1998 invoice

amount of $977,646.42.[2]

Pursuant to an April 5, 1999 letter agreement between Superior and MacSteel, on or about April 12, 1999, MacSteel's counsel received a payment of $293,770.00 from Dur-O-Wal. This reduced the amount in controversy accordingly to $439,267.22.

On or about May 26, 1999, MacSteel and Superior entered into an additional letter agreement. The May 26, 1999 letter agreement stated that it was in the parties' best interests to sell any coils of wire rod that remained from MacSteel's shipment to Superior in February 1998. Under the May 26, 1999 letter agreement, the parties agreed (1) to accept an offer from Dayton-Superior Corporation for the remaining wire rod, (2) that the $19,239.79 storage charges owed to Marine Transit Terminal were to be paid from the proceeds of the sale to Dayton-Superior Corporation, and (3) that MacSteel would pursue reimbursement of sixty-four percent of those storage costs ($12,313.47).

Pursuant to the May 26, 1999 letter agreement between Superior and MacSteel, on or about June 1, 1999, MacSteel received a monetary payment of $117,837.87 from Dayton-Superior Corporation. This payment reduced the amount in controversy to $321,429.35.

## CONCLUSIONS OF LAW

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (2002).

---

[2]MacSteel made this reduction based upon the fact that, in the opinion of a marine surveyor, of the 1,759 coils delivered by MacSteel to Superior, 352 coils, weighing 1,349,568 pounds, were damaged by saltwater rust, and eighty-eight coils, weighing 337,392 pounds, were physically damaged in that they became unwound prior to unloading in Joliet in February 1998. The parties understood that the saltwater and physically damaged coils did not conform to the specifications of the parties' agreement and remained the responsibility of MacSteel, and MacSteel reduced the amount claimed accordingly.

-8-

### *The Goods Conform to the Contract*

The Illinois Uniform Commercial Code applies to this transaction. 810 Ill. Comp. Stat. 5/1-101 *et seq*.

Section 5/2-106(2) provides, "Goods . . . are 'conforming' or conform to the contract when they are in accordance with the obligations under the contract." 810 Ill. Comp. Stat. 5/2-106(2) (2002). The wire rod delivered by MacSteel substantially conformed to the terms of the contract. The contract provides for the sale of 2,800 net tons of wire rod at a price of $14.50 cwt. The contract further provides that the chemistry of the wire will be as set forth in November 26, 1997 facsimile sent by MacSteel. Superior Wire's purchase order adds that the tensile strength of the wire rod will not be over 65,000 psi and that, at a 30% reduction of diameter, the tensile strength of the resultant wire will not exceed 100,000 psi. Nowhere is there a minimum tensile strength requirement. In any event, there is no dispute by Superior that the rod met the maximum tensile strength requirement of 65,000 psi on the rod and 100,000 psi on the wire at a 30% level of reduction. However, Superior claims that the rods did not comply with the contract because it had insufficient minimum tensile strength. Therefore, because MacSteel sold and delivered goods which are in accord with its obligations under the contract, it cannot be said to be in breach.

### *Superior's Acceptance*

Even if the rod was found to be non-conforming, Superior accepted the rod delivered by MacSteel. Under section 2-601 of the Uniform Commercial Code ("UCC"), if goods fail in any respect to conform to the contract, a buyer may (a) reject the whole, (b) accept the whole, or (c) accept any commercial unit or units and reject the rest. 810 Ill. Comp. Stat. 5/2-601 (2002).

Section 5/2-105 provides that a commercial unit is:

> such a unit of goods as by commercial usage is a single whole for purposes of sale and division of which materially impairs its character or value on the market or in use. A commercial unit may be a single article . . . or a set of articles . . . or a quantity or any other unit treated in use or in the relevant market as a single whole.

810 Ill. Comp. Stat. 5/2-105(6) (2002).

Section 2-606 of the UCC provides that the buyer accepts goods when: (1) after a reasonable opportunity to inspect the goods, the buyer signifies the seller that the goods are conforming or that it will take or retain them in spite of the non-conformity; (2) after a reasonable opportunity to inspect the goods, the buyer fails to make an effective rejection; or (3) the buyer "does any act inconsistent with the seller's ownership; but only if such act is wrongful as against the seller it is an acceptance only if ratified by him." 810 Ill. Comp. Stat. 5/2-606(1)(c) (2002).

Use or sale of the goods by a rejecting buyer are considered acts inconsistent with the seller's ownership. *Sherwin-Williams Co. v. March Charcoal Co., Inc.*, No. 80 C 4541, 1985 WL 3932, at *3 (N.D. Ill. Nov. 15, 1985). "Acceptance of a part of any commercial unit is acceptance of that entire unit." § 5/2-606(2). Through Superior's own use of the rod, as well as its resale of the rod to Royal Concrete Pipe and Dur-O-Wal between March 3, 1998 and September 24, 1998, Superior performed not just "any act" inconsistent with MacSteel's ownership of the goods, it performed multiple acts inconsistent with MacSteel's ownership of the goods. *Sherwin-Williams*, 1985 WL 3932, at *3 (N.D. Ill. 1985); *Lorenzo Banfi di Banfi Renzo & Co. v. Davis Congress Shops, Inc.*, 568 F. Supp. 432 (N.D. Ill. 1983); *Wolf Co. v. Monarch Refrigerating Co.*, 252 Ill. 491, 502-03 (1911); *Am. Theater Co. v. Siegel-Cooper & Co.*, 221 Ill 145, 147 (1906) ("The law does not permit a person to receive goods under a contract, appropriate them for his own use, and then defeat an action for the

purchase price on the ground that the goods were not of the exact quality or description called for by the contract."); *Phil Jacobs Co. v. Mifflin*, 23 Ill. App. 3d 999 (1974); *Ozite Corp. v. F.C. Clothier & Sons Corp.*, 130 Ill. App. 2d 716 (1970) . Thus, under either section 2-606(1)(b) or section 2-606(1)(c) of the UCC, Superior accepted the goods and is liable for their purchase price.

Under the UCC, buyers may revoke their acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to them if they have accepted it (1) reasonably assuming that its non-conformity would be cured and the non-conformity has not been seasonably cured or (2) "without discovery of such non-conformity if [their] acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." 810 Ill. Comp. Stat. 5/2-608(1) (2002). Buyers must revoke their acceptance within a reasonable time after they discover or should have discovered the ground for revocation and before any substantial change in condition of the goods which is not caused by the defects in the goods. § 5/2-608(2). A revocation is not effective until the buyer notifies the seller. § 5/2-608(2). Buyers who revoke have the same rights and duties with regard to the goods as buyers who reject. § 5/2-608(3). "[A] buyer may lose [its] right to revoke before or after its attempted revocation by the exercise of ownership over the goods." *Sherwin-Williams*, 1985 WL 3932, at *4.

Neither the July 14, 1998 nor the September 1, 1998 letters by Superior to MacSteel was a timely revocation of Superior's acceptance of the wire rod because Superior did not give notice to MacSteel of any non-conformity within a reasonable time. Revocation must occur within a reasonable time after the buyer discovers or should have discovered the ground for it. § 5/2-608(2). Superior performed its own tensile strength tests on the rod in late March 1998 and obtained results consistent with the mill test certificates. Thus, Superior was well aware of the tensile strength of the

-11-

goods and, thus, in possession of the "grounds" for any purported revocation based on insufficient tensile strength long before September 1998. Superior, therefore, cannot meet the "reasonable time" element required for an effective revocation. Even if Superior's letter of September 1, 1998 were to constitute an attempt to reject the goods, it is not an effective revocation because revocation of acceptance is possible only where the goods have a non-conformity that substantially impairs the value of the goods to the buyer. § 5/2-608(1). Here, the goods conformed to the contract and were not non-conforming in a way that substantially impaired the value of the goods to Superior.

Under the UCC, buyers may reject goods within a reasonable time after their delivery or tender. 810 Ill. Comp. Stat. 5/2-602(1) (2002). Rejection is ineffective unless the buyer seasonably notifies the seller. § 5/2-602(1). An action is taken seasonably "when it is taken at or within the time agreed or if no time is agreed at or within a reasonable time." 810 Ill. Comp. Stat. 5/1-204(3) (2002). "[W]hat is a reasonable time for taking any action depends on the nature, purposes and circumstances of such action." 810 Ill. Comp. Stat. 5/1-204(2) (2002). Neither the July 14, 1998 nor the September 1, 1998 letters by Superioir to MacSteel were timely rejections of the wire rod because Superior did not give notice to MacSteel of any non-conformity within a reasonable time.

After rejecting the goods, buyers cannot exercise ownership over any commercial unit. § 5/2-602(2)(a). Buyers who take possession of the goods before rejecting them have a duty to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them. § 5/2-602(2)(b). Buyers have no other obligations to goods that have been rightfully rejected. § 5/2-602(2)(c). Superior's conduct in the resale of the rod, as mentioned above, did not comply with this obligation; and Superior acted in a manner which was the exercise of the right of ownership of the goods.

*Express and Implied Warranties*

MacSteel did not breach any warranty regarding the rods. Under section 2-313 of the UCC, any affirmation of fact or promise by the seller to the buyer relating to the goods becomes part of the basis of the bargain and creates an express warranty that the goods shall conform to the affirmation or promise. 810 Ill. Comp. Stat. 5/2-313(1)(a) (2002). Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods will conform to the description. § 5/2-313(c). The description of the wire rod in the P.O. as "mesh quality" did not create an express warranty that the wire rod would conform to that description.

Under section 2-314 of the UCC, a warranty that the goods will be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. 810 Ill. Comp. Stat. 5/2-314(1) (2002). Goods are merchantable if they: (1) pass without objection in the trade under the contract description; (2) are fit for the ordinary purposes for which such goods are used; (3) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and (4) conform to the promises or affirmations of fact made on the container or label, if any. § 5/2-314(2)(a), (c), (d), (f). There was no breach of the implied warranty of merchantability because the wire rod was fit for the ordinary purposes for which wire rod is used. Superior, itself, used twenty-one tons of the rod. It resold over two million pounds of it to at least three other third parties (Royal Concrete, Dur-O-Wal, and Richmond Anchor and Screw); and the balance of the wire rod was eventually taken by Dayton-Superior and used by Dur-O-Wal. Although Superior claims wire made from this rod could not meet the particular wire standards of ASTM A-82, Dur-O-Wal used the rod it purchased to produce wire subject to ASTM A-82.

Under section 2-315 of the UCC, an implied warranty of fitness for a particular purpose is created where the seller, at the time of contracting, has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods. 810 Ill. Comp. Stat. 5/2-315 (2002). There was no breach of an implied warranty of fitness for a particular purpose because Superior was not relying on MacSteel's skill or judgment to select wire rod. Rex had twenty-five years of experience in the industry and was not relying on MacSteel's skill and judgment, rather than his own skill and judgment, when he was purchasing the rod. Rex independently investigated the Krivoy Rog product by calling others in the industry before making his decision to purchase.

If the buyer has breached, a seller may recover the balance of the contract price under section 2-709 of the UCC. 810 Ill. Comp. Stat. 5/2-709 (2002). Superior breached its contract with MacSteel by not making payment when payment was due after accepting the goods. MacSteel is entitled to the agreed to balance of the contract price. Second, in addition to the principal amount of $321,429.35, MacSteel is also entitled to the amount of $12,313.47 in storage costs, as set forth in the May 26, 1999 agreement between the parties.

Illinois law permits interest at a rate of five percent per annum on all moneys after they become due on any bond, bill, promissory note, or instrument of writing. 815 Ill. Comp. Stat. 205/2 (2002). MacSteel is entitled to this prejudgment interest pursuant to statute.

It is therefore ordered that judgment be entered in favor of Plaintiff, the MacSteel International USA Corporation, in the sum of $333,742.82 plus prejudgment interest at a rate of five percent per annum, on Plaintiff's complaint. Judgment is entered in favor of Plaintiff and against Defendant on Defendant's counterclaim.

John W. Darrah, Judge
United States District Court

Date: March 27, 2002